NOT RECOMMENDED FOR PUBLICATION

File Name: 06a0756n.06

Filed: October 12, 2006

No. 05-4592

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

REGAL CINEMAS, INC.,

     Plaintiff-Appellant,

v.

AVG MEDINA, LLC,

     Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

_____/


**BEFORE:**     CLAY and SILER, Circuit Judges; and STAFFORD, District Judge.[*]

    **CLAY, Circuit Judge.** In this appeal from the district court's denial of summary judgment to Plaintiff, Regal Cinemas, Inc., ("Regal"), and grant of summary judgment to Defendant, AVG Medina, LLC ("Medina"), Plaintiff challenges the district court finding that Plaintiff was not entitled to a reduction in rent under the terms of a Second Amendment to the parties' original lease.

    For the reasons that follow, we hold that the district court correctly gave effect to the unambiguous language of the Second Amendment to the parties' original lease, and we **AFFIRM** the district court's grant of Defendant's motion for summary judgment.

---

    [*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

**BACKGROUND**

On October 31, 1997, Plaintiff entered into a twenty-year lease agreement with Defendant's predecessor, Medina Theater Associates, LLC. Plaintiff leased a 64,247 sq. ft. theater building, located in Medina County, Ohio, in order to operate a 16 auditorium movie theater.

Under the terms of the original lease ("the lease"), Plaintiff paid both a minimum rent and percentage rent. The minimum rent was provided for in Section 4.03 of the lease, and is defined as the "base rent payable during each Lease Year by Tenant." (J.A. at 30.) The minimum rent was calculated by dollars per square foot. For example, the lease specified that "[f]or the first seven (7) Lease Years of the Rent Term, Tenant's annual Minimum Rent shall be at the annual rate of Fifteen Dollars and Zero cents ($15.00) per square foot of the [Gross Leasable Area][1] of the premises." (J.A. at 30.)

The provisions relating to percentage rent appear in Section 4.04 of the lease. The relevant portions are recounted here:

> From the Rent Commencement Date through the end of the Term and any extension
> or renewal thereof, Tenant's percentage Rent per Calendar Year or Partial Calendar
> Year shall be Eight Percent (8%) of Gross Sales[2] in excess of the applicable

---

[1]As defined in the lease, Gross Leasable Area (GLA) means "the number of square feet of floor area in the Theatre building, not including mezzanines and balconies which are not used to display stock for sale and not otherwise open to customers, clients and invitees of Tenant." (J.A. at 19.)

[2]The lease provides that:

The phrase '**Gross Sales**' wherever used herein is defined to mean the aggregate of adjusted Gross Ticket Sales and other Gross Sales. The phrase '**Gross Ticket Sales**' wherever used herein is hereby defined to mean all box office receipts for the sale of tickets for admission to the Theater. The phrase '**Other Gross Sales**' wherever used

Percentage Rent Breakpoint. The **"Percentage Rent Breakpoint"** shall be determined by dividing the total amount of the Minimum Rent paid by Tenant during the applicable Calendar Year or Partial Calendar year by eight one-hundredths (.08), with the quotient of such division being equal to the Percentage Rent Breakpoint . . .

(b) Adjusted Gross Ticket Sales. Percentage Rent on Gross Ticket sales is based on Tenant renting each film shown at the Premises at the rental rate of 39% or less of Gross Ticket Sales for that film (the "39% Rate"). If Tenant's film rental payment to its distributor for a film is at a rate greater than the 39% Rate, whether expressed in those terms or expressed otherwise such as the "90/10 Rule", (herein the "Greater Rate"), the Gross Ticket Sales for the film rented at the Greater Rate shall be deemed to be in the reduced amount for the purposes of Percentage Rent, using the following **"Adjustment Formula"**;

> Subtract from the amount of actual Gross Ticket Sales in a Calendar Year or Partial Calendar Year, as the case may be, the product of: (i) the difference between the Greater Rate and the 39% Rate multiplied by (ii) the Gross Ticket Sales.
>
> Illustratively:
>
> Gross Ticket Sales = $10,000
> Greater Rate = 44%
> Greater Rate - 39% Rate = 5%
> 5% of $10,000 = $500
> Gross Ticket Sales for percentage Rent = $9,500

(J.A. at 31-32.) The original lease further required Plaintiff to furnish Defendant's predecessor with reports detailing any gross ticket sales for films rented at the greater rate. The lease also expressly provided that upon request, either party had the right to request an estoppel certificate "certifying as

---

herein is defined to mean all proceeds received by or payable to Tenant from all other business conducted in, at or from the Premises.

(J.A. at 31.) (quoting Section 4.04(a)(i) of the lease).

to such matters as may be reasonably requested and to the extent such matters are as stated . . . with respect to the Premises or this Lease."[3] (J.A. at 56.)

Plaintiff was going through a Chapter 11 bankruptcy in 2001, and the parties agreed to restructure and modify the lease such that Plaintiff would pay less rent, in an effort to keep Plaintiff from having to default on the lease. To that end, the parties executed the "Second Amendment to Shopping Center Lease" ("Second Amendment") on November 2, 2001. The Second Amendment modified both the minimum rent and the percentage rent payable under the lease. Paragraph Two of the Second Amendment modified the minimum rent due, stating that "Section 4.03 of the Lease shall be deleted and replaced" with a new Section 4.03, which changed the minimum rent due to a fixed amount of $695,977.00 per year.[4] (J.A. at 67-68.) Paragraph Three of the Second Amendment modified the percentage rent due. It stated the following:

> 3. **Modification of Percentage Rent**. Landlord and Tenant do hereby agree that effective as of the first full Calendar Year after the Effective Date and every full Calendar Year thereafter during the Rent term (but not during any Extension period), Tenant's Percentage Rent for each such Calendar Year shall be equal to Twenty Percent (20%) of all Gross Ticket Sales (as defined in Section 4.04(a)(i) of the Lease) made in the Premises in excess of the Percentage Rent Breakpoint established by this Amendment. The "Percentage Rent Breakpoint" for purposes of this Amendment shall be Two Million Dollars ($2,000,000.00). For example, if the Effective Date is December 1, 2001 and Gross Ticket Sales for the Calendar Year 2002 are $2,500,000.00, the Percentage Rent for Calendar Year 2002 shall be

---

[3]The lease was first amended on December 17, 1997 to change the size of the property being rented. There is no dispute about that first amendment, and it is irrelevant to these proceedings.

[4]This amendment to the minimum base rent constituted a significant reduction in the amount of base rent Plaintiff had to pay. Under the original lease, the base rent was $948,900.00 per year for the first seven years, $996,345.00 per year for the next seven years, and $1,045,687.80 per year for the last six years.

$100,000.00 calculated as follows: $2,500,000 - 2,000,000.00 = 500,000 x .20 = 100,000. For all Calendar Years to which this paragraph applies, the Percentage Rent set forth in this Amendment shall be paid by Tenant in lieu of the Percentage Rent set forth in Section 4.04 of the Lease, and the calculation of the amount of Percentage Rent due for each such Calendar Year shall be as provided in this Amendment instead of the Percentage Rent calculation provisions set forth in Section 4.04 of the Lease.

(J.A. at 68-69.)

The Second Amendment also included a "Representations and Warranties of Tenant" section, Paragraph 5, in which Plaintiff agreed to warrant Defendant that it had "employed independent attorneys as experts to evaluate this Amendment, has read and fully understands all the provisions hereof, is voluntarily entering into this Amendment, and except as provided herein has not relied upon any statement, representation, or advice of Landlord or the attorneys employed by Landlord in entering into this Amendment." (J.A. at 71.) Crucially, the Second Amendment also contained interpretation, integration and ratification clauses:

7. **Interpretation**. If any conflict between the terms of this Amendment and the terms of the Lease occurs, the terms of this Amendment shall govern and control in all respects. It is the intention of the Landlord and Tenant with respect to the subject matter hereof that the terms of this Amendment shall supersede and replace in each and every respect the terms and provisions of the Lease which the parties intend to modify pursuant to the terms hereof.

8. **Entire Amendment.** This Amendment constitutes the complete agreement of Landlord [Defendant] and Tenant [Plaintiff] with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Amendment. This Amendment may not be amended except by an instrument in writing signed by the parties hereto.

10. **Ratification**. Except as hereinabove set forth, the Lease shall remain unmodified and in full force and effect, and the Landlord and Tenant do hereby ratify and confirm the Lease, as modified and amended herein.

(J.A. at 72-73.) Following execution of the Second Amendment and for the ensuing two years, Plaintiff paid rent in the manner prescribed by the Second Amendment; namely, Plaintiff paid the reduced base rent of $695,997, and paid percentage rent calculated at 20% of gross sales in excess of $2 million. In the Fall of 2004, Medina Theater Associates, LLC, sold the subject property to Defendant, AVG-Medina, LLC. As part of that sale, on September 23, 2004, the parties executed a Tenant Estoppel Certificate, in which Plaintiff certified, in pertinent part, that:

> Tenant [Plaintiff] has no current offsets or credits against rentals due or to become due under the Lease . . . [and] is not currently entitled to any concession or rebate of rent or other charges from time to time due and payable under the Lease, except as may be provided therein, and there are no unpaid or unreimbursed construction allowances or other offsets due Tenant under the Lease.

(J.A. at 198.) Plaintiff claims that it subsequently discovered that it overpaid rent in the years 2002, 2003 and 2004 because it "failed to deem Gross Ticket Sales to be in a reduced amount as permitted and provided by the film cost deduction set forth in Section 4.04(b) of the Lease." (Pl.'s Br. at 9.) Plaintiff claims that it overpaid rent by $73,471.15 in 2004, $70,749.23 in 2003, and by $69,478.58 in 2002 for a total overpayment of $213,698.96.

On June 21, 2005, claiming diversity jurisdiction, Plaintiff filed suit against Defendant in the United States District Court for the Northern District of Ohio alleging, *inter alia*, that it mistakenly overpaid percentage rent to Defendant for the years 2002, 2003, and 2004. Defendant answered the complaint on July 11, 2005, raising the affirmative defenses of failure to state a claim, waiver, estoppel, unclean hands, and laches.

6

On July 20, 2005, Plaintiff filed a Rule 56 motion for summary judgment. In its motion for summary judgment, Plaintiff claimed that there was "no factual dispute" and that as a matter of law, it "should be entitled to apply the plain language of the Second Amendment and section 4.04(b) of the Lease to deem Gross Ticket Sales to be in a reduced amount for the purpose of Percentage Rent." (J.A. at 88.) Subsequently, Defendant filed a cross-motion for summary judgment on September 13, 2005, in which it declared that the lease terms "are clear on their face and cannot be subject to any other reasonable interpretation other than their plain meaning," and in which it also stated that "[t]he percentage rent provisions of the subject lease, as amended, contain a formula for the calculation of percentage rent, which ***does not*** include a reduction of [Plaintiff's] film rental costs from the calculation of gross sales." (J.A. at 93.) (emphasis added). On October 28, 2005, the district court issued its memorandum of opinion. Therein, it denied Plaintiff's motion for summary judgment, and granted Defendant's motion for summary judgment. Plaintiff filed this timely appeal on November 3, 2005.

## DISCUSSION

**THE DISTRICT COURT PROPERLY GRANTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND FOUND THAT PLAINTIFF WAS NOT ENTITLED TO A REDUCTION IN PERCENTAGE RENT UNDER THE TERMS OF THE SECOND AMENDMENT TO THE ORIGINAL LEASE**

### A.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). Summary judgment is proper so long as the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

7

When evaluating cross-motions for summary judgment, the Court is obligated to analyze each motion on its own merits and view facts and inferences in the light most favorable to the non-movant. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

**B.     Ohio Substantive Contract Law Gives Effect to the Plain Language of a Contract**

There is no dispute between the parties about what standards of law should apply. Because this case comes before this Court on diversity jurisdiction, Ohio substantive contract law applies. Both the lease and the Second Amendment constitute contracts between the parties, and thus this Court should "employ [its] usual method of contract construction in defining disputed terms." *State ex. rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004). "The purpose of contract construction is to effectuate the intent of the parties, and that intent is presumed to reside in the language they chose to employ in the agreement." *Id.* (citations and quotations omitted). Courts should only look to extrinsic evidence of the parties' intent when the language is unclear or ambiguous, "or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Id.; see also Layne v. Progressive Preferred Ins. Co.*, 820 N.E.2d 867, 869 (Ohio 2004) ("When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.") (internal citations omitted). When the language is unambiguous, however, it will be enforced as written. *See Ledyard v. Auto-Owners Mut. Ins. Co.*, 739 N.E.2d 1, 3-4 (Ohio Ct. App. 2000) (citations omitted).

The district court concluded that "based on the plain and unambiguous language of the Second Amendment, Section 4.04 of the lease is no longer applicable." (J.A. at 246.) The district court reasoned that the language in Paragraph 3, coupled with the language in Paragraph 7, clearly indicate that the Second Amendment superseded Section 4.04 of the lease. Further, the district court rejected Plaintiff's argument that the Adjustment Formula in the lease continued to apply. In making this argument, Plaintiff alleged that "Section 4.04(a)(i) of the lease defines gross ticket sales as "the aggregate of *adjusted* gross ticket sales and other gross sales," and . . . the Second Amendment does not address the adjusted formula reduction." (J.A. at 246.) The district court found Plaintiff's argument "incorrect" because the Plaintiff erroneously sought to rely upon a definition of gross sales which had, in fact, been deleted from the percentage rent calculation in the Second Amendment. (J.A. at 246.) Thus, according to the district court, "under the plain and unambiguous terms of the Second Amendment, the Adjusted Formula, which is factored into the calculation for Gross Sales, is no longer applicable." (J.A. at 246.) The district court concluded that, under the Second Amendment, Plaintiff is not entitled to the reduce its percentage rent according to the adjusted formula. This Court agrees.

The unambiguous language of the Second Amendment clearly establishes percentage rent in the amount of 20% of *all gross ticket sales* and explicitly declares that the method set forth for calculating percentage rent in Paragraph 3 of the Second Amendment is to be used "*instead of*" the method in Section 4.04 of the lease. (J.A. at 68.) (emphasis added). Any suggestion by Plaintiff to the contrary is belied not only by the language in Paragraph 3 itself, but also by the express language of the "Interpretation" clause, (J.A. at 72.) ("[T]he terms of this Amendment shall supersede and

9

replace in each and every respect the terms and provisions of the Lease which the parties intend to modify pursuant to the terms hereof."), and by the language of the "Entire Amendment" clause. (J.A. at 72.) ("[A]ny prior agreements, promises, negotiations, or representations are superseded by this Amendment.")

The parties clearly intended Paragraph 3 to control the method of calculating the percentage rent due. Paragraph 3 makes no mention whatsoever of adjusted gross ticket sales (which are not the same as gross ticket sales), nor does it make any reference to the Adjustment Formula and the differing calculation for the greater rate. Paragraph 3 says that gross ticket sales are defined by Section 4.04(a)(i) of the Amendment, and when this Court looks to Section 4.04(a)(i), it finds gross ticket sales defined as "all box office receipts for the sale of tickets for admission to the Theater." (J.A. at 31.) In fact, the provisions related to adjusted gross ticket sales and the Adjustment Formula appear in Section 4.04(b), not in Section 4.04(a)(i). The distinction for adjusted gross ticket sales is conspicuously absent in Paragraph 3, and this Court declines to edit it back in. The parties went to great lengths to ensure that the Second Amendment plainly and unambiguously replaced Section 4.04 with Paragraph 3. If the parties had intended that the Adjustment Formula for adjusted gross ticket sales be used, they would undoubtedly have included this in Paragraph 3.

Furthermore, as with Section 4.04 of the lease, Paragraph 3 of the Second Amendment explicitly illustrates how the percentage rate should be calculated. While the illustration under Section 4.04 included the Adjustment Formula, the example under Paragraph 3 in the Second Amendment merely shows a formula for 20% of gross ticket sales. There is no Adjustment Formula calculation in the example accompanying Paragraph 3.

10

Finally, this Court finds Plaintiff's arguments here to be somewhat disingenuous given that Plaintiff not only expressly certified in the document that Plaintiff's attorneys had reviewed and agreed with the Second Amendment, but also given the fact that it was actually Plaintiff who sought to alter the lease terms during its bankruptcy. Under the Second Amendment, Plaintiff received a substantial break on the base rent due under the original terms, while the amount of percentage rent correspondingly increased. This Court finds the terms of the Second Amendment relating to the percentage rent to be just as clear and unambiguous as the terms relating to the base rent. Moreover, this Court finds incredible Plaintiff's argument that it misunderstood for three years the terms of a contract that it freely bargained for and expressly ratified.

## CONCLUSION

The district court did not err in granting Defendant's motion for summary judgment and in determining that Plaintiff was not entitled to a reduction in percentage rent under the Second Amendment to the lease. For the reasons set forth above, we **AFFIRM** the district court's grant of Defendant's motion for summary judgment.